# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**MARYANN MARTINEZ,**

       **Plaintiff,**

      **vs.**                                           **Civ. No. 14-1134  KK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion"), filed on July 27, 2015.  (Doc. 19.)  The Commissioner of Social Security ("Commissioner") filed a Response on October 22, 2015 (Doc. 24), and Plaintiff filed a Reply on November 12, 2015.  (Doc. 25.)  Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

## I.  Standard of Review

    Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether substantial evidence supports the Commissioner's final decision[2]; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).   If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 8, 9.)

[2]  A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Courts must meticulously examine the entire record, but may neither reweigh the evidence nor substitute their judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the court may not reweigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II. Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any

other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) she is not engaged in "substantial gainful activity"; *and* (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) her impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) she is unable to perform her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261. If the claimant cannot show that her impairment meets or equals a Listing, but she proves that she is unable to perform her "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering her residual functional capacity ("RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "This is true

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

despite the presence of counsel." *Henrie*, 13 F.3d at 361. "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92. The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

### III. Background and Procedural Record

Plaintiff Maryann Martinez ("Ms. Martinez") was born on May 18, 1987. (Tr. 190.[4]) Ms. Martinez completed the eleventh grade in 2006.[5] (Tr. 212.) Ms. Martinez's work history included work as a deli clerk at a convenience store and housekeeping for a hotel. (Tr. 212.)

On May 13, 2011, Ms. Martinez protectively filed[6] an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, and concurrently filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3).[7] (Tr. 190-93, 207-18.) Ms. Martinez alleged a disability onset date of April 12, 2011, because of depression, anxiety, fibromyalgia, lupus,

---

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 16) that was lodged with the Court on May 22, 2015.

[5] Ms. Martinez testified she only completed the ninth grade. (Tr. 52.) Ms. Martinez reported to LISW Sylvia Starr of New Mexico Behavioral Health Institute that she left school in the tenth grade. (Tr. 452.) Ms. Martinez reported to State agency medical consultant Warren Steinman, Ph.D., that she went to school until her sophomore year. (Tr. 472.)

[6] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits. The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application. *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

[7] The ALJ stated in his determination that Ms. Martinez's application for disability benefits was initially denied because her earnings record at the time did not establish enough quarters of coverage. (Tr. 24.) However, after her 2011 earnings were considered, Ms. Martinez established a date of first insured of April 1, 2011, and a date of last insured of September 30, 2011. (*Id.*)

insomnia, rheumatoid arthritis, chronic migraines, and tightening jaw.  (Tr. 207, 211.)

Ms. Martinez has not engaged in substantial gainful activity since her alleged disability onset

date.  (Tr. 27.)  Ms. Martinez's date of last insured was September 30, 2011.[8]  (Tr. 24.)

Ms. Martinez's application for SSI was initially denied on November 7, 2011.[9]  (Tr. 80,

81-92, 107-110.)  Ms. Martinez's application was denied again at reconsideration on March 22,

2012.  (Tr. 93, 94-106, 114-17.)  On April 30, 2012, Ms. Martinez requested a hearing before an

Administrative Law Judge ("ALJ").  (Tr. 119-21.)  The ALJ conducted a hearing on May 7,

2013.  (Tr. 47-79.)  Ms. Martinez appeared in person at the hearing with her attorney Reta

Price.[10]  (*Id.*)  The ALJ took testimony from Ms. Martinez (Tr. 52-71) and an impartial

vocational expert ("VE"), Pamela Bowman.  (Tr. 71-76.)

On July 22, 2013, the ALJ issued an unfavorable decision.  (Tr. 21-41.)  At step one, he

found that Ms. Martinez had not engaged in substantial gainful activity since her alleged onset

date.  (Tr. 27.)  The ALJ therefore proceeded to step two and found that Ms. Martinez suffered

from the following severe impairments: "lupus, depression, and fibromaylgia."  (*Id.*)  At step

three, the ALJ concluded that Ms. Martinez did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404,

Subpart P, Appendix 1. (Tr. 28.)

Because he found that Ms. Martinez's impairment did not meet a Listing, the ALJ went

on to assess Ms. Martinez's RFC, which is used to evaluate the claim at both step four and step

---

[8] To receive benefits, Ms. Martinez must show she was disabled prior to her date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

[9] *See* fn. 7, *supra*.

[10] Ms. Martinez is represented in this proceeding by Attorney Michael Armstrong.  (Tr. 17-19.)

five.  20 C.F.R. §§ 404.1520(a)(4), 404.1520 (e, f, g), 416 920(a)(4), 416.920 (e, f, g).  The ALJ stated that

> [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she can never climb ladders, ropes, or scaffolds; frequently (as opposed to constant) handle and finger bilaterally; and is further limited to unskilled work.

(Tr. 33.)  At step four, the ALJ concluded that Ms. Martinez could not perform any past relevant work.[11]  (Tr. 39.)   At step five, the ALJ determined that considering Ms. Martinez's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform.  (*Id*.)

On October 22, 2014, the Appeals Council issued its decision denying Ms. Martinez's request for review and upholding the ALJ's final decision. (Tr. 1-4.)  In reviewing her case, the Appeals Council stated

> We also looked at a medical source statement from Dr. Lyle Amer, MD, dated June 24, 2014.  The Administrative Law Judge decided your case through July 22, 2013.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before July 22, 2013.

(Tr. 2.)  On December 17, 2014, Ms. Martinez timely filed the instant action seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

## IV.  <u>Analysis</u>

Ms. Martinez asserts two arguments in support of reversing and remanding her case, as follows: (1) the Appeals Council committed legal error in determining that the medical source statement from Ms. Martinez's treating rheumatology specialist Lyle Amer, M.D., did not constitute new, material and chronologically pertinent evidence; and (2) the ALJ's RFC failed to

---

[11] The ALJ noted that the VE testified that Ms. Martinez could return to her job as a deli clerk.  (Tr. 39)  However, the ALJ determined that the record did not show that this qualified as past relevant work because of the length of time Ms. Martinez performed it.  (*Id.*)

account for the findings of evaluating psychologist Warren Steinman, treating therapist Carole Pozzi, and evaluation notes of LISW Sylvia Starr and CNS Karen Lee. (Doc. 19 at 13-25.) Ms. Martinez's motion will be granted and the case will be remanded to the Commissioner for the reasons discussed below.

A.      Ms. Martinez's Autoimmune Disease Diagnoses[12]

1.      El Centro Family Health

On July 7, 2010, Ms. Martinez presented to El Centro Family Health in Las Vegas, New Mexico, to follow up on "UNM Labs." (Tr. 281.) She also had complaints of back, neck and abdominal pain. (*Id.*) Provider notes indicate that Ms. Martinez had recently given birth to a daughter who was diagnosed with neonatal systemic lupus erythematosus (SLE).[13] (*Id*). As a result, Ms. Martinez reported she was tested and also found to be positive for SLE. (*Id.*) On this basis, Ms. Martinez was referred for a rheumatology consult in Santa Fe.[14] (*Id.*)

2.      Mills Avenue Medical Clinic

On August 5, 2010, Ms. Martinez presented to Dr. Thomas Strain of Mills Avenue Medical Clinic in Las Vegas, New Mexico, with complaints of joint pain in her knees, ankles, hands, fingers, neck and shoulders. (Tr. 313.) Ms. Martinez reported her recent lupus diagnosis. (*Id.*) Dr. Strain's exam notes indicated Ms. Martinez's joints were tender. (*Id.*) He assessed arthralgia and questioned the presence of lupus. (*Id.*) Dr. Strain planned to obtain records from

---

[12] The Court has considered the entire record; however, because the Court is recommending remand based on the newly submitted evidence from Ms. Martinez's treating rheumatologist that is related to her autoimmune diagnoses, the Court has limited its discussion of Ms. Martinez's medical history.

[13] "Neonatal lupus is a passively transferred autoimmune disease. It occurs in about 1 to 2 percent of babies born to mothers with autoimmune disease, primarily systemic lupus erythematosus (SLE) and Sjögren's syndrome, and antibodies to Ro/SSA (Sjögren syndrome type A antigen) and/or La/SSB (Sjögren syndrome type B antigen)." http://www.uptodate.com/contents/neonatal-lupus.

[14] On July 28, 2010, Ms. Martinez called El Centro Family Health requesting a new rheumatology referral. (Tr. 344.) She explained that she missed her appointment scheduled with Dr. Stoick and that he was refusing to make a second appointment with her. (*Id.*)

Ms. Martinez's previous providers and prescribed Sulindac.[15]  (*Id.*)  He instructed Ms. Martinez to return in three weeks.  (*Id.*)

On August 16, 2010, Ms. Martinez returned to Mills Avenue Medical Clinic and saw Raymond Ortiz, M.D.  (Tr. 311-12.)  Ms. Martinez reported a lot of joint pain and that the Sulindac was not helping.  (*Id.*)  On exam, Dr. Ortiz observed no swelling or redness in Ms. Martinez's joints, and found no limitation in her range of motion.  (*Id.*)  Dr. Ortiz gave Ms. Martinez a Kenalog[16] injection, and instructed her to continue taking Sulindac until her scheduled appointment with Dr. Strain the following week.  (*Id.*)

On August 21, 2010, Ms. Martinez followed up with Dr. Strain.  (Tr. 309.)  Dr. Strain noted that he had not yet seen any lab reports indicating she had lupus.  (*Id.*)  On exam, however, he noted positive findings of a skin rash, that her legs were tender on the lower thigh area near the patella, and that she had some slight swelling of her fingers with some achiness of the joints. (*Id.*)  Dr. Strain assessed arthralgias and planned to order laboratory studies to include an ANA test, C-reactive protein, CPK, comprehensive metabolic profile, and hepatitis liver function tests along with hepatitis-B and C.  (*Id.*)  He instructed Ms. Martinez to follow up after the testing. (*Id.*)

On September 7, 2010, Ms. Martinez presented to Dr. Strain to follow up on lab results. (Tr. 306-08.)  She also had complaints of nausea and right ankle pain.  (Tr. 306-08.)  On exam, Ms. Martinez was noted to be walking with a slight limp.  (*Id*.)  Notes also indicate that the lab

---

[15] Sulindac is a nonsteroidal anti-inflammatory drug used for treating pain, fever, and inflammation. http://www.medicinenet.com/sulindac/article.htm

[16] Kenalog is a corticosteroid used to treat inflammation.  http://www.drugs.com/kenalog.html.

work previously ordered needed to be repeated and that she would be notified with the results. (*Id.*)

On September 21, 2010, Ms. Martinez returned to Dr. Strain for her lab results.[17] (Tr. 303-04.)   Dr. Strain informed Ms. Martinez that the ANA laboratory study was highly positive for lupus, and that additional tests also indicated the presence of either lupus or Sjögren's syndrome.  (*Id.*)  Dr. Strain scheduled Ms. Martinez for a rheumatology consult with Dr. Lyle Amer.  (*Id.*)

On March 26, 2011, Ms. Martinez presented to Dr. Strain with complaints of joint pain all over.  (Tr. 287-89.)  On exam, Dr. Strain noted that Ms. Martinez's ankles were tender to palpation, but that there was no swelling or redness.  (*Id.*)  Dr. Strain assessed lupus and joint pain, and prescribed Sulindac.  (*Id.*)

On April 4, 2011, Ms. Martinez reported to Dr. Strain that pustules had appeared on her neck several days ago, and that she was getting some on her hairline and arm.  (Tr. 284-86.)  On exam, Dr. Strain noted mostly healed eruptions from left side of neck onto the top of her shoulders and upper arm.  (*Id.*)  Dr. Strain diagnosed herpes zoster, and instructed her to stay off work until the scales dried and to continue all her medications.  (*Id.*)

### 3.      Lyle B. Amer, M.D.

On October 18, 2010, Ms. Martinez presented to Rheumatologist Lyle B. Amer, M.D., in Santa Fe, New Mexico.  (Tr. 354.)  Ms. Martinez complained of joint pain and swelling in her ankles, feet, hands, fingers, knuckles, and knees.  (*Id.*)  She reported that her elbows were also

---

[17] Results from Quest Diagnostics Incorporated indicated a positive ANA screen, and positive Sjögren's Antibodies SS-A and SS-B.  (Tr. 314.)  The interpretation of these findings "suggests Sjögrens syndrome.  These antibodies may occasionally be positive early in other connective tissue diseases.  A positive result at this stage of testing stops further testing, and does not preclude additional positive antibodies.  Clinical correlation is required to assess the need for testing additional analyses."  (Tr. 315.)

starting to hurt.  (*Id.*)  Ms. Martinez stated she gets a rash on her face on and off.  (*Id.*)  On exam,

Dr. Amer noted no joint swelling or rashes.  (*Id.*)  His assessment questioned diagnoses of SLE,

inflammatory arthritis, and fibromyalgia.  (*Id.*)  Dr. Amer planned to obtain additional laboratory

studies,[18] and prescribed Prednisone and Tramadol.  (*Id.*)  Dr. Amer indicated he would follow

up with Ms. Martinez after obtaining the lab results.  (*Id.*)

On November 8, 2010, Ms. Martinez saw Dr. Amer for lab results, and reported neck

pain and headaches.  (Tr. 353.)  Ms. Martinez reported that the Prednisone had helped, but had

increased her headaches.  (*Id.*)  Dr. Amer informed Ms. Martinez she had a positive ANA test,

but that all inflammatory markers were within normal limits.  (*Id.*)  Dr. Amer assessed +ANA

and neck pain.  (*Id.*)  He planned to obtain additional lab work,[19] along with an x-ray of the

cervical spine.  (*Id.*)  Dr. Amer prescribed Soma[20] and instructed Ms. Martinez to call for lab and

radiology results.  (*Id.*)

On December 13, 2010, Ms. Martinez saw Dr. Amer and reported that her neck hurt, that

she was not sleeping well, and that her eyes burned a little at times.  (Tr. 353.)  Dr. Amer

informed her that the cervical spine x-ray was negative, but that lab work indicated the presence

of HLA-B27.[21]  (*Id.*)  Dr. Amer observed no joint swelling.  (*Id.*)  He assessed HLA-B27+, and

---

[18] Dr. Amer ordered an ANA test, general chemistry, cardiac testing, iron studies, thyroid studies, immunochemistry and hematology studies.  (Tr. 370-76.)

[19] Dr. Amer ordered lab studies for HLA-B27, Centromere Antibody IgG, DNA Double Stranded Antibody IgG, RNP Antibody IgG, Scl 70 Antibody IgG, Sm Antibody IgG, SS-A/Ro Antibody IgG, and SS-B/La Antibody IgG. (Tr. 365-69.)

[20] Soma is a muscle relaxant.  http://www.drugs.com/imprints/soma-350-19472.html.

[21] The presence of HLA-B27 suggests a greater-than-average risk for developing or having certain autoimmune disorders.  https://www.nlm.nih.gov/medlineplus/ency/article/003551.htm.

prescribed Sulfasalazine,[22] Clonazepam,[23] and Lortab.[24]   (*Id.*)   Dr. Amer also ordered a bone scan.  (*Id*.)

On January 7, 2011, Ms. Martinez saw Dr. Amer and complained of pain in her hands, ankles, feet, and knees.  (Tr. 352.)  She stated she had not noticed a difference on Sulfasalazine.  (*Id.*)  She reported sleeping well with Clonazepam.  (*Id.*)  Dr. Amer noted that Ms. Martinez's bone scan indicated mild uptake at the sternoclavicular joints bilaterally, but no other areas.[25]  (*Id.*)  Dr. Amer did not observe any joint swelling.  (*Id.*)  He assessed mild inflammatory arthritis, HLA-B27+, and fibromyalgia.  (*Id.*)  Dr. Amer prescribed Gabapentin[26] and Clonazepam.  (*Id.*)

On January 19, 2011, Ms. Martinez reported bad headaches almost daily for the previous two weeks.  (Tr. 352.)  She also reported a rash on her fingers and sores in her mouth for two days, but now resolving.  (*Id.*)  Dr. Amer observed one small resolving brownish lesion on one of her left hand fingers.  (*Id*)  Dr. Amer assessed SLE and headaches.  (*Id.*)  He prescribed Fioricet,[27] discontinued the Gabapentin, and provided samples of Lyrica 50 mg.[28]

On February 7, 2011, Ms. Martinez stated that the Lyrica had worked for her and she thinks an increased dose may help her more.  (Tr. 351.)  Ms. Martinez also indicated she wanted

---

[22] Sulfasalazine is used to treat rheumatoid arthritis and other autoimmune conditions. http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Treatments/Sulfasalazine-Azulfidine.

[23] Clonazepam is used to treat panic disorders and anxiety.  http://www.drugs.com/clonazepam.html.

[24] Lortab is used to treat moderate to severe pain.  http://www.drugs.com/lortab.html.

[25] The radiologist indicated this is likely degenerative or inflammatory.  (Tr. 363.)

[26] Gabapentin is used to treat nerve pain.  http://www.drugs.com/gabapentin.html.

[27] Fioricet is used to treat tension headaches.  http://www.drugs.com/fioricet.html.

[28] Lyrica is used to treat fibromyalgia.  http://www.drugs.com/lyrica.html.

to try medical marijuana.  (*Id*.)   Dr. Amer assessed +HLA-B27 and fibromyalgia.  (*Id*.)
Dr. Amer provided samples of Lyrica 75 mg.  (*Id*.)

On March 30, 2011, Dr. Amer noted a telephone call from Ms. Martinez requesting pain
relief.  (Tr. 355.)  Ms. Martinez reported she had been to the emergency room twice for pain, and
that her insurance company had denied her request for Lyrica.  (*Id*.)  Dr. Amer prescribed Lortab,
but noted he did not want her to use it for her treatment.  (*Id*.)

On March 31, 2011, Ms. Martinez saw Dr. Amer and reported increased pain and lesions
on her left neck.  (Tr. 350.)  Ms. Martinez stated she had been to the hospital in Las Vegas, but
they told her it was nothing.  (*Id*.)  Dr. Amer observed several mostly scabbed zoster lesions
going down the side of Ms. Martinez's neck to the top of her shoulders.  (*Id*.)  He assessed
herpes zoster, fibromyalgia and SLE.  (*Id*.)  Dr. Amer prescribed oral and cream Acyclovir[29] and
Soma.  (*Id.*)  He instructed Ms. Martinez that she could take Lortab twice a day.  (*Id*.)  Dr. Amer
also provided samples of Lyrica and noted he would call the insurance company regarding its
denial.  (*Id*.)

On April 25, 2011, Ms. Martinez presented to Dr. Amer and reported that her two year
old son had "drowned last week in septic tank."  (Tr. 350.)  Ms. Martinez reported being
depressed and in a lot of pain.  (*Id*.)  Dr. Amer assessed depression and questioned Sjögren's
syndrome.  (*Id.*)  Dr. Amer prescribed Zolpidem,[30] Lortab, and Citalopram.[31]

On December 16, 2011, Ms. Martinez told Dr. Amer that her children were placed in
foster care after her two year old drowned, but had recently been placed back in her custody.

---

[29]  Acyclovir is used to treat the pain and speed the healing of blisters caused by herpes zoster.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a681045.html.

[30]  Zolpidem is used to treat insomnia.  http://www.drugs.com/zolpidem.html.

[31]  Citalopram is an antidepressant.  http://www.drugs.com/citalopram.html.

(Tr. 494.)  Ms. Martinez stated that her 19 month old daughter was being treated for lupus at UNM.  (*Id.*)  Ms. Martinez complained that her ankles, hips, wrists, knuckles, jaw and knees were hurting.  (*Id.*)  Dr. Amer noted that Ms. Martinez's joints and skin appeared okay.  (*Id.*)  He assessed Sjogren's syndrome and +HLA-B27, and questioned SLE.  (*Id*).  Dr. Amer prescribed Sulfasalizine, Citalopram, Pilocarpine,[32] and Lortab.  (*Id.*)

On January 15, 2013, Ms. Martinez presented to Dr. Amer with complaints of pain originating in her neck that traveled down her right arm, with spasms and numbness in her bicep area.  (Tr. 504.)  She stated that her depression was up and down and that she had poor sleep.  (*Id.*)  She informed Dr. Amer that she was moving to Albuquerque.  (*Id.*)  Dr. Amer noted no joint swelling or skin rash.  (*Id.*)  He assessed SLE/RA/depression, DDD (degenerative disc disease) with radiculopathy.  (*Id.*)  Dr. Amer planned to order lab work and a cervical spine MRI.[33]  (*Id.*)  Dr. Amer prescribed Lortab, Clonazepam, and Paroxetine.[34]

On June 24, 2014, Dr. Amer prepared a Medical Assessment of Ability to Do Work-Related Activities (Physical) based on Ms. Martinez's medical history and the chronicity of findings as from 2011 to current examination.  (Tr. 8.)  Dr. Amer assessed that Ms. Martinez's joint pain, back pain, arthritis, and fatigue limited her ability to do work-related physical activities.  (*Id.*)  Specially, Dr. Amer assessed that Ms. Martinez (1) was unable to maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; (2) could occasionally lift and/or carry less than 10 pounds; (3) could frequently lift and/or carry less than 5 pounds; (4) was able to stand or walk less than 2 hours in an 8-hour

---

[32] Pilocarpine is used to treat dry mouth associated with Sjögren's Syndrome.  http://www.drugs.com/cdi/pilocarpine.html.

[33] Ms. Martinez had a cervical spine MRI on March 29, 2013.  (Tr. 526-28.)  Findings showed a "reversal of the normal cervical lordosis" that could be positional or related to muscle spasm.  (*Id.*)

[34] Paroxetine is used to treat depression.  http://www.drugs.com/paroxetine.html.

day; (5) was able to sit less than 4 hours in an 8-hour day; (6) had limited ability to push and/or pull; and (7) could only occasionally kneel, stoop, crouch and crawl.  (*Id.*)

On June 24, 2014, Dr. Amer also prepared a Medical Assessment of Ability to Do Work-Related Activities (Non-Physical) based on Ms. Martinez's medical history and the chronicity of findings as from 2011 to current examination.  (Tr. 9.)  Dr. Amer assessed that Ms. Martinez suffered from a pain producing impairment that was severe and caused sleep disturbances and fatigue.  (*Id.*)  Dr. Amer assessed that Ms. Martinez has *marked* limitations in her ability to (1) maintain physical efforts for long periods without a need to decrease activity or pace; (2) sustain ordinary routine without special supervision; and (3) complete a normal workday and workweek without interruptions from pain or fatigue.  (*Id.*)  Dr. Amer assessed that Ms. Martinez had *moderate* limitations in her ability to (1) maintain attention and concentration; (2) perform activities within a schedule; (3) maintain regular attendance and be punctual within customary tolerance; and (4) work in coordination with or proximity to others without being distracted by them.  (*Id.*)  Dr. Amer assessed that Ms. Martinez had *slight* limitations in ability to make simple work-related decisions.  (*Id.*)  Dr. Amer opined that Ms. Martinez was "disabled by lupus and arthritis causing pain and fatigue and decrease[d] level of concentration."  (*Id.*)  Dr. Amer opined that Ms. Martinez cannot work.  (*Id.*)

### 4.   Em Ward, M.D., L.L.C.

On October 21, 2011, Ms. Martinez presented to State agency medical consultant Em Ward, M.D., for a consultative exam.  (Tr. 477-81.)  Ms. Martinez stated that the primary reason she was seeking disability was because of lupus.  (Tr. 477.)  She reported that her main symptoms were "joint pain and swelling, difficulty sleeping, and a lot of discomfort with everything."  (*Id.*)  She stated that her ankles, wrists and knuckles were the main joints affected,

but also her knees and elbows.  (*Id.*)  Dr. Ward performed a physical exam and his impressions

were as follows:

> Impressions:
>
> 1.   Arthralgias and myalgias – I recommend obtaining medical records from
>      UNMH (including rheumatology notes) and the lab results mentioned in
>      the office notes from outpatient visits in Las Vegas.  She may have mild
>      SLE with possible Sjogren Syndrome with the SLE currently quiescent or
>      minimally symptomatic.  RA would also be in the differential.  For mild
>      SLE, the prognosis overall is good with the possibility of relapses.
>      Currently, I believe she is capable of light-to-moderate duty.
>
> 2.   Depression and anxiety – I recommend a mental health evaluation and
>      defer to the provider regarding suitability to the workplace.

(Tr. 480.)

### 5.      Case Analysis - Michael Slager, M.D.

On October 26, 2011, State agency nonexamining medical consultant Michael Slager,

M.D., reviewed Ms. Martinez's medical records and concluded that Ms. Martinez

> has had a +ANA in a speckled pattern (most common pattern and least specific)
> which is seen in SLE, mixed connective tissue disease, scleroderma, and
> Sjogren's syndrome.  Her +SSA and SSB are much more often + in Sjogren's.
> There does not appear to be adequate exam findings to make a [diagnosis] of FM.
> There is no evidence for active arthritis/synovitis in available MER, just the c/o
> arthralgias.  Regardless of the foregoing, [Ms. Martinez] does not have evidence
> for severe physical limitation on exam.  There is no evidence for HA arising to a
> level of severe limitation.  She is given a moderate RFC in consideration of her
> pain.

(Tr. 90-91).  Dr. Slager's RFC assessed Ms. Martinez as capable of a full range of medium

exertional level work, and assessed nonexertional postural limitations of (1) constant stooping,

(2) frequent climbing of ramps and stairs, kneeling, crouching and crawling, and (3) only

occasional climbing of ladders, ropes and scaffolds.  (Tr. 88-89.)  Dr. Slager did not assess any

other nonexertional limitations related to Ms. Martinez's ability to do work-related physical

activities.  (*Id.*)

6.      **Case Analysis – N. D. Nickerson, M.D.**

On March 19, 2012, State agency nonexamining medical consultant N. D. Nickerson, M.D., reviewed Ms. Martinez's medical records at reconsideration.  (Tr. 101.)  Dr. Nickerson stated that additional records had been received, but that none pertained to treatment for Ms. Martinez's reported impairments.   (*Id.*)     Dr. Nickerson commented that although Ms. Martinez complained that her wrists hurt, she was able to get her children ready for school, cook, clean, and shop in stores.   (*Id.*)  Dr. Nickerson stated it was reasonable to affirm Dr. Slager's RFC.  (*Id.*)

**B.      Consideration of Additional Evidence**

On July 2, 2014, approximately one year after the ALJ's determination, Ms. Martinez submitted to the Appeals Council two medical source statements from her treating rheumatologist, Dr. Amer.  (Tr. 7-9.)  In each of the medical source statements at issue, Dr. Amer was instructed to

> . . .  Identify the particular medical findings (*i.e.,* physical exam findings, x-ray findings, laboratory test results, history, symptoms (including pain and other subjective symptoms), etc., which support your assessment of any limitations. Please consider patient's medical history and the chronicity of findings as *from 2011 to current examination*.

(Tr. 8-9) (emphasis added).  Dr. Amer assessed a number of limitations as to Ms. Martinez's ability to do work-related physical and non-physical activities.  (*Id., see* Section IV.A.3, *supra*.) The medical source statements were signed and dated on June 24, 2014.  (Tr. 8-9.)  Ms. Martinez requested that the newly submitted evidence be made part of the record on review.  (Tr. 7.)  The Appeals Council denied Ms. Martinez's request to review her case, and stated that the newly submitted information, dated June 24, 2014, was "about a later time," and did not affect whether

she was disabled prior to the ALJ's decision.[35]  (Tr. 2.)  Ms. Martinez argues that the Appeals Council committed legal error when it determined that the medical source statements from Dr. Amer were not related to the relevant period of time.  (Doc. 19 at 13-18.)  Ms. Martinez contends that Dr. Amer's medical source statements qualify as new, material, and chronologically pertinent to the relevant period of time, and that the Appeals Council was required to review the material under a treating physician analysis.  (*Id.*)  Ms. Martinez asserts that Dr. Amer's medical source statements were new because they were not duplicative or cumulative, were material because they could change the outcome of the ALJ's determination, and were related to the relevant period of time because they addressed Dr. Amer's assessment of her functional limitations due to her autoimmune diagnoses from 2011 onward.  (*Id.*)  The Commissioner contends that the Appeals Council correctly determined that Dr. Amer's medical source statements pertained to a time period after the ALJ's 2013 decision because they were dated in June 2014.  (Doc. 24 at 14-16.)

The Appeals Council will grant review of a case if, *inter alia*, "the claimant submits additional evidence that is new, material, and related to the period on or before the date of the ALJ decision."  20 C.F.R. §§ 404.970(b) and 416.1470(b) *see also Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) (holding that under 20 C.F.R. §§ 404.970(b) and 416.1470(b) the Appeals Council must consider evidence submitted with a request for review if it is new, material, and related to the period on or before the date of the ALJ's decision).

This means the evidence is:

1.      Not part of the claim(s) record as of the date of the ALJ decision;

---

[35] This indicates that the Appeals Council did not consider the substance of the new evidence when it denied review of Ms. Martinez's claim.  *See Box v. Shalala*, 52 F.3d 168, 172 (8th Cir. 1995) (finding that the Appeals Council's determination that new evidence did not relate relevant time indicated the substance of the evidence had not been considered).

2.      Relevant, *i.e.*, involves or is directly related to issues adjudicated by the ALJ; and

3.      Relates to the period on or before the date of the ALJ, meaning it is (1) dated before or on the date of the ALJ decision, or (2) post-dates the ALJ decision but is reasonably related to the time period adjudicated by the ALJ.

NOTE 1:      The AC does not apply a strict deadline when determining if post-dated evidence relates to the period at issue.   There are circumstances when evidence dated after the ALJ decision relates to the period at issue.   For example, a statement may relate to the period at issue when it postdates the decision but makes a direct reference to the time period adjudicated by the ALJ.   This may be especially important in a claim involving a date last insured (DLI) where a statement from a treating source dated after an ALJ decision specifically addresses the time period before the DLI.

Commissioner's Hearings, Appeals and Litigation Manual ("HALLEX") I-3-3-6(B); *see also Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (affirming that evidence is new if it is not duplicative or cumulative, and is material if there is a reasonable possibility it could change the outcome).   The Tenth Circuit has repeatedly held that whether evidence is "new, material and chronologically pertinent is a question of law subject to our *de novo* review."   *Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011) (quoting *Threet*, 353 F.3d at 1191) (citing *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004)).

If the evidence does not qualify, it plays no further role in judicial review of the Commissioner's decision.   If the evidence does qualify and the Appeals Council considered it "in connection with the claimant's request for administrative review (regardless of whether review was ultimately denied), it becomes part of the record we assess in evaluating the Commissioner's denial of benefits under the substantial-evidence standard."   Finally, if the evidence qualifies but the Appeals Council did not consider it, the case should be remanded for further proceedings.

*Chambers*, 389 F.3d at 1142 (quoting *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)).

"[O]ur general rule of *de novo* review permits us to resolve the matter and remand if the Appeals

Council erroneously rejected the evidence." *Krauser*, 638 F.3d at 1328 (citing *Chambers*, 389 F.3d at 1142).

Thus, whether Dr. Amer's medical source statements regarding Ms. Martinez's abilities to do work-related physical and non-physical activities were new, material, and chronologically pertinent is a question of law subject to our *de novo* review. *Threet*, 353 F.3d at 1191. Although the Appeals Council rejected the newly submitted evidence on the ground that it was not related to the relevant time period, the Court addresses all three criteria as part of its *de novo* review.

Dr. Amer's medical source statements are new evidence. "Evidence is new within the meaning of [404.970(b) and 416.1470(b)] if it is not duplicative or cumulative." *Threet*, 353 F.3d at 1191 (citations omitted). Dr. Amer's medical source statements were not available to the ALJ at the time he made his decision. Additionally, there are no other treating source medical assessments in the record. For these reasons, this evidence is neither duplicative nor cumulative and is considered new.

Dr. Amer's medical source statements are material. Evidence is material to the determination of disability "if there is a reasonable possibility that [it] would have changed the outcome." *Threet,* 353 F.3d at 1191 (citations omitted). Here, the ALJ relied on the opinion of State agency consultative examiner Dr. Ward, and the opinions of State agency nonexamining medical consultants Dr. Slager and Dr. Nickerson, to make his RFC assessment. (Tr. 37-38.) Dr. Amer was Ms. Martinez's treating rheumatologist, whose opinion must be given controlling weight if it is well supported and not inconsistent with the other substantial evidence in the case record. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) ("[a]n ALJ is required to given controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

other substantial evidence in the record").  Additionally, the opinion of a treating physician is generally given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  Dr. Amer's assessment calls into question the ALJ's RFC assessment because, if adopted, it would impose greater limitations on Ms. Martinez's abilities to do work-related physical and non-physical activities.  For this reason, this evidence is material.

Finally, Dr. Amer's medical source statements present circumstances to suggest they may relate to the period at issue.  It is undisputed that the date on which Dr. Amer completed the medical source statements post-dates the ALJ's decision.  However, the medical source statements make a direct reference to the time period adjudicated by the ALJ; *i.e.,* 2011 to the current examination.  (*Id.*)  *See* HALLEX I-3-3-6(B) (noting that there are circumstances when evidence dated after the ALJ decision relates to the period at issue, such as when a statement makes a direct reference to the time period adjudicated).  Moreover, Dr. Amer's treating source relationship with Ms. Martinez precisely correlates with the time period referenced in the medical source statements.[36]  As such, Dr. Amer's *assessment* of Ms. Martinez's limitations could and likely does apply to the relevant period of time, despite the fact that he completed the medical source statements after the ALJ's decision.  Further, it is not clear whether the *current examination* referred to in the medical source statements refers to the date Dr. Amer completed the medical source statements, or refers to the date the medical evidence record supports that Dr. Amer last examined Ms. Martinez, which was January 15, 2013.  (Tr. 504.)  If that were the case, January 15, 2013, falls within the period of adjudication and would also make the newly

---

[36] The medical evidence record supports that Dr. Amer saw Ms. Martinez ten times from October 18, 2010, until January 15, 2013.  (Tr. 350-55, 494, 504.)

submitted evidence related to the relevant period of time.[37]   There is no evidence that the Appeals Council considered these circumstances when it determined whether to consider the additional evidence, as it was required to do.  *Id.*   Instead, it appears that the Appeals Council applied a strict deadline and determined that the evidence did not relate to the relevant time period because the medical source statements were dated after the ALJ's decision.  This is error. In light of these ambiguities, and absent developing the record, there is no way of knowing with certainty whether Dr. Amer's assessment relates to the relevant time period and the Court will not speculate.

For the foregoing reasons, the Court finds there are circumstances present to suggest that the newly submitted evidence is related to the time period adjudicated by the ALJ and that the Appeals Council erroneously rejected it.  Therefore, this case must be remanded for the Appeals Council to develop the record as necessary, and review the new evidence as required under 20 C.F.R. §§ 404.970(b), 416.1470(b) and §§ 404.1527(e)(3) and 416.927(e)(3).

## C.   Remaining Issues.

The Appeals Council has the responsibility in the first instance to determine whether, following submission of additional, qualifying evidence, the ALJ's decision "is contrary to the weight of the evidence currently of record."  *Chambers*, 389 F.3d at 1143.  "Only after the Appeals Council makes this determination do the courts properly review the denial of benefits – if that [is] the Appeals Council's decision - on the entire record under the deferential substantial-evidence standard."  *Id.*

---

[37] January 15, 2013, is after Ms. Martinez's date of last insured.  (Tr. 24.)  However, it would nonetheless be within the period of adjudication for her SSI claim.

21

Additionally, the Court will not address Ms. Martinez's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### V.  Conclusion

For the reasons stated above, Ms. Martinez's Motion to Reverse or Remand for Rehearing is **GRANTED.**  This matter is remanded for further proceedings consistent with the Court's findings.

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**